657 P.2d 613

**STATE of New Mexico, Petitioner,**

v.

**John H. SNEDEKER, Respondent.**

No. 13,786.

Supreme Court of New Mexico.

July 14, 1982.

Jeff Bingaman, Atty. Gen., Heidi Topp Brooks, Asst. Atty. Gen., Santa Fe, for petitioner.

Leon Taylor, Albuquerque, for respondent.

## OPINION

EASLEY, Chief Justice.

Snedeker, the former President of Western New Mexico University, was indicted for evading gross receipts taxes and for twenty-two counts of making false public vouchers. The trial court decided that an affidavit for search warrant did not show probable cause. The court suppressed evidence seized under that warrant, as well as evidence seized under a subsequent warrant which relied upon information obtained in the first search.

The State appealed to the Court of Appeals, which affirmed the decision of the trial court. We granted certiorari and we reverse the decisions of both courts below.

The issues are: (1) whether the affidavit for the search warrant contained sufficient evidence to give the magistrate probable cause to believe (a) that Snedeker obtained or possessed the property in question in a manner which constituted a criminal offense or, (b) that the property would be material in a criminal prosecution; and (2) whether the allegations in the affidavit gave the magistrate probable cause to believe the property was at Snedeker's residence.

Officer Darrell Allred of the New Mexico State Police executed the Affidavit for Search Warrant. He described a certain house in Silver City and claimed there was property concealed there. A list of fifty-three items was attached as an exhibit. It included specific descriptions of 241 boxes of ammunition, representing approximately 12,000 rounds of ammunition for a possible sixteen different types of weapons, including: .44 magnum, .41 magnum, .357 magnum, .32 caliber, .25 caliber, .41 caliber, .45 caliber, .44 caliber, .44 special, .38 caliber automatic, .38 special, 9mm luger, .410 shotgun, 12 gauge shotgun, and 20 gauge shotgun.

The list also included: pistol magazines for a Llama automatic .45 caliber and for a super automatic .38, six pistol holsters, three pistol grips, 8 boxes of reloading slugs, a barrel for a .32 Browning, a .32 caliber magazine, 15 packs of .38 special reloads and numerous other items for use in reloading ammunition, ten boxes of rifle slugs for use in 20 and 12 gauge shotguns, two large zipper cases and nine small ones, and "all weapons" using a number of the specified types of ammunition.

The officer alleged in the affidavit that the property was concealed at the house described, that it had been obtained or possessed in a manner constituting a criminal offense, and that it would be material evidence in a criminal prosecution.

Other sworn statements of the officer are set out at length:

During the course of an investigation into the purchase of weapons and ammunition by Western New Mexico University I have obtained copies of university warrants along with supporting documents for the purchase of numerous quantities of ammunition. The total amount being listed on Exhibit A. Substantial quantities of this ammunition are for weapons which are not owned by Safety & Security of Western New Mexico University.

In addition, the quantity of ammunition is far in excess of the use requirements of Safety & Security at Western New Mexico University.

Numerous items on Exhibit A are reloading supplies. My investigation has revealed that Safety & Security of Western New Mexico University does not reload ammunition.

Based on my investigation all this ammunition was ordered by John H. Snedeker and was delivered to John H. Snedeker during the last three fiscal years, being 1977–1978, 1978–1979, and 1979–1980.

I was personally present when an entire inventory of all property belonging to Safety & S-curity [sic] was conducted on July 10, 1980. None of this ammunition appeared in the property. No ammunition was found in the inventory. Based on my investigation none of the ammunition appears to be accounted for from the records of Western New Mexico University.

All the purchases herein described were personally approved by John H. Snedeker and the warrants and the purchase orders signed by him.

Based on my investigation none of the items on Exhibit A were requested by anyone authorized to do so by Security personnal [sic] at Western New Mexico University.

I have personally checked with many of the local vendors in Silver City, being Cosgroves, Gibson's, Silver Sports, Colby's and Western Antiques.

Based on my investigation John H. Snedeker moved from the official President's residence located at 500 College Avenue on or about June 30, 1980. His personal and household effects have been moved to the location above described to the best of my knowledge. Many of the items on Exhibit A can be identified by the vendors do [sic] to price tag markings and other descriptive writings which may still be on the cartons containing the ammunition.

Based on my investigation, I believe that the items listed on Exhibit A may constitute evidence of violations of the laws of the State of New Mexico with regard to the payment of public monies.

The non-ammunition items of Exhibit A, based on my investigation, can also be traced by the vendors should any price tag markings still be legible.

The affidavit was submitted to Magistrate Scholl who then issued a search warrant. The warrant was executed, resulting in the seizure of one hundred eighty-four items consisting of firearms, various firearms supplies, and boxes of ammunition.

Based on observations made while executing the first warrant, a second warrant was obtained and executed, resulting in the seizure of additional items.

Snedeker moved to suppress the evidence, claiming it was the product of illegal searches and seizures. The trial court granted the motion and the Court of Appeals affirmed the decision, holding that the first affidavit did not establish probable cause, and that the second warrant was invalid because it was based upon information obtained in the first illegal search. The Court of Appeals further held that a third warrant issued during the investigation was invalid in that it did not establish probable cause to believe that a criminal offense had been committed.

The fourth amendment to the Constitution of the United States prohibits unreasonable searches and seizures and is intended to protect the sanctity of a person's home and privacy. *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). In *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) the Court first stated the judicially created exclusionary rule to effectuate the rights against unlawful searches. The rule was held applicable to the states in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

Prior to *Mapp,* courts relied to a great extent on the principle that the use of illegally obtained evidence would make the courts accomplices in the violation of the Constitution, *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); *see Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), which would contaminate the judicial process and taint judicial integrity. *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). However, *Mapp* relied principally upon the theory that excluding admissible evidence obtained by an unlawful search would have the effect of deterring future unlawful police conduct.

The debate over the usefulness of the exclusionary rule and the principles behind its application has gone on unabated. However, the United States Supreme Court in *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) put a number of the controverted issues in focus. That Court held that the concept of "preserving the integrity of the judicial process ... has limited force as a justification for the exclusion of highly probative evidence." *Id.* at 485, 96 S.Ct. at 3048 (footnote omitted). The Court stated: "The primary justification for the exclusionary rule then is the

deterrence of police conduct that violates Fourth Amendment rights." *Id.* at 486, 96 S.Ct. at 3048.

■ The Court reiterated that the rule is not a personal constitutional right, but a judicially created remedy to safeguard fourth amendment rights through its deterrent effect. The policies behind the rule are not absolute. "Rather, they must be evaluated in light of competing policies." *Stone v. Powell, supra,* at 488, 96 S.Ct. at 3049. The public interest in the determination of the truth at trial must be weighed against the incremental benefit of applying the rule.

The costs of applying the exclusionary rule even at trial and on direct review are well known: the focus of the trial, and the attention of the participants therein, are diverted from the ultimate question of guilt or innocence that should be the central concern in a criminal proceeding. Moreover, the physical evidence sought to be excluded is typically reliable and often the most probative information bearing on the guilt or innocence of the defendant. * * * Application of the rule thus deflects the truthfinding process and often frees the guilty. The disparity in particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the rule is contrary to the idea of proportionality that is essential to the concept of justice. Thus, although the rule is thought to deter unlawful police activity in part through the nurturing of respect for Fourth Amendment values, if applied indiscriminately it may well have the opposite effect of generating disrespect for the law and administration of justice.

*Id.* at 489–91, 96 S.Ct. at 3050–51 (footnotes omitted).

Chief Justice Burger wrote a strong concurring opinion in *Powell,* charging that the rule "has become a doctrinaire result in search of validating reasons"; that a more "clumsy" means of imposing sanctions is "difficult to imagine"; that in certain instances its application it is "sophisticated nonsense"; that it exacts "exorbitant costs from society purely on the basis of speculation and unsubstantiated assumptions"; that the rule is a "Draconian, discredited device in its present absolutist form"; and that "persons who commit serious crimes continue to reap the enormous and undeserved benefits" from the rule. *Id.* at 496–501, 96 S.Ct. at 3053–3056. Chief Justice Burger discussed "overruling this judicially contrived doctrine—or limiting its scope to egregious, bad-faith conduct. * * *" *Id.* at 501, 96 S.Ct. at 3055. Justice White, in his dissent, stated that the exclusionary rule constitutes a "senseless obstacle to arriving at the truth in many criminal trials." *Id.* at 538, 96 S.Ct. at 3072.

It seems rather strange that *Powell* was decided in 1976, but Shepard's citations do not show that the case has ever been cited in an appellate opinion in this state.

The ultimate holding in *Powell* was that the exclusionary rule would have minimal application in federal habeas corpus cases involving collateral attacks on state court convictions. The Court concluded that prisoners would not be granted federal habeas corpus relief where the states had provided opportunities for full and fair litigation of fourth amendment claims of unconstitutional search and seizure.

Thus, the decision in *Powell* was considerably narrower than the issues in our case. However, the language was quite broad and warrants our attention at all levels of the judiciary as these cases arise and proceed through the system. *Powell* demonstrated that the Supreme Court has forged numerous exceptions to the rule in order to temper its harsh impact on society. *See California v. Minjares,* 443 U.S. 916, 100 S.Ct. 9, 61 L.Ed.2d 892 (1979).

## 1. The Affidavit For Search Warrant— Probable Cause.

A search warrant will issue only on a sworn written statement of facts showing probable cause. N.M.R.Crim.P. 17(a), N.M. S.A.1978 (Repl.Pamp.1980). Probable cause must be based on substantial evidence.

N.M.R.Crim.P. 17(f). The evidence used may be hearsay, provided (1) there is a substantial basis for believing the source of the hearsay to be credible, and (2) there is a substantial basis for believing that there is a factual basis for the information furnished. *Id.* This is essentially the two-prong test enunciated in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), which was designed to prevent the magistrate from becoming a "rubber stamp" for law enforcement officers.

Where the information is based upon the personal knowledge of the affiant, the magistrate need only determine whether sufficient underlying circumstances exist to support the affiant's belief. *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). This is reflected in the requirement of Rule 17 that probable cause be based upon substantial evidence.

In *State v. James,* 91 N.M. 690, 694, 579 P.2d 1257, 1261 (N.M.Ct.App.), *cert. denied,* 91 N.M. 751, 580 P.2d 972 (1978), the court said:

"Probable cause" means a reasonable ground for belief of guilt. It exists where the facts and circumstances within the knowledge of the officers, based on reasonably trustworthy information, is sufficient to warrant a man of reasonable caution to believe that an offense has been or is being committed. [Citations omitted.]

"Simply stated, the magistrate, from the verified facts presented to him, must believe that the source is credible and that a factual basis exists for the information furnished." *State v. Gutierrez,* 91 N.M. 542, 545, 577 P.2d 440, 443 (N.M.Ct.App.1978).

Standards for the determination of probable cause have been stated by this Court in *State v. Bowers,* 87 N.M. 74, 76, 529 P.2d 300, 302 (N.M.Ct.App.1974), where it was held that "(1) only a probability of criminal conduct need be shown; (2) there need be less vigorous proof than the rules of evidence require to determine guilt of an offense; (3) common sense should control; (4) great deference should be shown by courts to a magistrate's determination of probable cause. [Citations omitted.]"

In *United States v. Ventresca, supra,* the United States Supreme Court wrote:

[T]he Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. * * * A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

*Id.* 380 U.S. at 108, 85 S.Ct. at 746.

When reviewing affidavits in support of search warrants, a magistrate, and an appellate court, must consider the affidavit as a whole. *State v. Duran,* 90 N.M. 741, 568 P.2d 267 (N.M.Ct.App.1977). All direct and circumstantial evidence alleged, as well as all reasonable inferences to be drawn from those allegations, should be considered. *See State v. Luna,* 92 N.M. 680, 594 P.2d 340 (N.M.Ct.App.1979). *Accord State v. Bloom,* 90 N.M. 192, 561 P.2d 465 (1977); *State v. Vigil,* 87 N.M. 345, 533 P.2d 578 (1975). A material fact need not be proved by direct evidence. It is sufficient if there is evidence from which the fact can properly be inferred. *Dull v. Tellez,* 83 N.M. 126, 489 P.2d 406 (1971).

As stated in *Bendorf v. Volkswagenwerk Aktiengeselischaft,* 90 N.M. 414, 419, 564 P.2d 619, 624 (N.M.Ct.App.), *cert. denied,* 90 N.M. 636, 567 P.2d 485 (1977):

A reasonable inference is a conclusion arrived at by a process of reasoning. This conclusion must be a rational and logical deduction from facts admitted and established by the evidence, when those facts are viewed in the light of common experience. [Citations omitted.]

*See also Gray v. E.J. Longyear Company,* 78 N.M. 161, 429 P.2d 359 (1967).

In *Airco Supply Company v. Albuquerque National Bank,* 68 N.M. 195, 200, 360 P.2d 386, 401 (1961), this Court said:

[I]nferences may properly be drawn from circumstantial evidence, and * * * a well connected train of circumstances, as are present in this case, is as cogent of the existence of a fact as any array of direct evidence, and may even outweigh opposing direct testimony. [Citations omitted.] *See also Ulibarri v. Village of Los Lunas,* 79 N.M. 421, 444 P.2d 606 (1968).

With these well-established principles of law in mind, we now inquire into the state of mind of Magistrate Scholl at the time the Affidavit For Search Warrant was presented to him by Officer Allred. Scholl, who is not a lawyer, was charged with examining the affidavit as a whole and determining if the facts and circumstances recited therein, and all reasonable inferences deducible therefrom, showed probable cause for him to believe that Snedeker obtained or possessed the listed property in a manner which constituted a criminal offense or that the property would be material in a criminal prosecution.

The affidavit presented to Scholl by Allred showed that Allred was an agent of the Criminal Investigation Bureau of the New Mexico State Police. The facts and circumstances shown in the instrument and some reasonable and obvious inferences that probably influenced Scholl are as follows: Allred was personally conducting an investigation into the purchase of weapons and ammunition "by Western New Mexico University"; it was a thorough, extensive inquiry; and Allred had obtained copies of University warrants and other supporting documents, including purchase orders, showing the purchase of quantities of ammunition. It may be inferred that he examined those documents and knew which department was shown as the purchaser, the name of the person who had signed the purchase orders and warrants, and the name of the person who had signed the receipts for the deliveries of the property.

The records inspected showed that the President of the University had personally ordered and personally received all the listed firearm supplies which included over 12,-000 rounds of ammunition for approximately sixteen guns, enough to start a small revolution. These were extraordinarily suspicious circumstances.

Allred went to the Safety & Security Department of the University, presumably because it was the department shown on the warrants as the purchaser of the ammunition and other supplies. He was present when an "entire inventory of *all* property belonging to Safety & Security was conducted." (Emphasis added.) This inventory undoubtedly would include all types of guns used by the department, as well as all types of ammunition and reloading equipment, if any. The officer found none of the listed ammunition in the department. Although there were reloading supplies listed on the documents, he found that the University did not reload ammunition. This could be easily determined if no reloading supplies or equipment were found in the inventory.

Allred came to the conclusion that the ammunition ordered was far in excess of the amount needed by the department, which seems quite obvious. Knowing that the officer had seen the type of guns used by the department, Scholl could have believed the officer's statement that "substantial quantities of this ammunition are for weapons which are not owned by Safety & Security." Furthermore, he was probably suspicious of the sophistication of the weaponry, the number of weapons indicated, the variation in types and sizes, and particularly the rifle slugs for two sizes of shotguns. What possible use could a small college in a small city have for shotguns shooting rifle slugs? Was Scholl to infer from these circumstances that the University was declaring war on Mexico, or that Snedeker was probably issuing false vouchers? Also, Scholl could easily infer from the circumstances of this thorough investigation that the officer had found all pertinent records and had examined them before he stated that none of the ammunition "appears to be accounted for from the records" of the University.

The rest of the allegations in the affidavit are corroborative. The key here is

whether Scholl, applying common sense and reasonable caution, had probable cause to think the massive amount of missing munitions indicated that a crime had been committed and that the man who had signed the purchase orders and University checks used to pay for the goods, and who had personally received the goods, must have possession of them. Scholl thought so. His decision is entitled to great deference. *Bowers, supra.*

To hold that this search warrant is invalid would be to compound the toll that is being taken on society and on the integrity of the courts by an absolutist application of the exclusionary rule. Some of our judges have quite obviously been intimidated by the supposed constitutional mandates and have applied loose logic and rubber-stamp reactions when any small item appeared to be wrong.

█ There are items in this affidavit that do not by themselves show probable cause. The warrant is not rendered invalid by the inclusion in the affidavit of some information that is not supported by probable cause. The warrant may nevertheless stand if the remaining allegations demonstrate probable cause. *United States v. Lucarz,* 430 F.2d 1051 (9th Cir.1970).

We hold that the affidavit clearly showed probable cause that Snedeker had been making false vouchers. We reverse the Court of Appeals and the trial court.

2. Probable Cause To Search Snedeker Home.

A further requirement for a valid search warrant is that the warrant be based on a showing of probable cause that the items to be seized are located at the place to be searched. *Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas, supra.*

█ We find that the magistrate had probable cause to believe that Snedeker lived in the house to be searched under the proposed warrant. However, Allred did not state specific reasons to indicate why he considered that the property was located in that house. This is not fatal to the validity of the warrant. The circumstances and the reasonable inferences therefrom may be called upon to support the magistrate's decision.

In *United States v. Mulligan,* 488 F.2d 732, 736 (9th Cir.1973), *cert. denied,* 417 U.S. 930, 94 S.Ct. 2640, 41 L.Ed.2d 233 (1974), the court considered a similar problem and stated:

> Although there was no direct evidence that any evidence from the burglary was inside Dinsio's residence, there was sufficient evidence from which the magistrate could use his common sense to infer that the loot and tools, if not buried, were probably in the house. [Citation omitted.]

In *United States v. Lucarz, supra,* thirty-six envelopes containing $29,000 in cash were stolen from the post office. The court held that the value and bulk of the stolen items would sustain an inference that they were at the defendant's home. The court in *Lucarz, supra,* at 1055, said:

> The situation here does not differ markedly from other cases wherein this court and others, albeit usually without discussion, have upheld searches although the nexus between the items to be seized and the place to be searched rested not on direct observation, as in the normal search-and-seizure case, but on the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property. *United States v. Teller,* 412 F.2d 374 (7th Cir.1969); *Aron v. United States,* 382 F.2d 965 (8th Cir. 1967); *Anderson v. United States,* 344 F.2d 792 (10th Cir.1965); *Porter v. United States,* 335 F.2d 602 (9th Cir.1964).

In the instant case, the affidavit gave probable cause to believe that defendant still possessed a large amount of valuable ammunition and supplies. It was a reasonable inference that the valuable property would be kept at his house. *United States*

*v. Rahn,* 511 F.2d 290 (10th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975); *United States v. Samson,* 533 F.2d 721 (1st Cir.1976).

■ If stolen property is not inherently incriminating and there is probable cause to believe a suspect has committed the theft, the magistrate can assume that the property will be found at the suspect's residence. *Rosillo v. State,* 278 N.W.2d 747 (Minn. 1979). *See also United States v. Rahn, supra.*

■ We must always remember that we are considering the probable thought processes of the magistrate as he examined the affidavit for search warrant. He must have thought Snedeker had the property. Would he keep it at his home, as suggested in the affidavit? If not, what other inferences were available? Would Snedeker bury the valuable munitions, place them in a bank vault, or leave them with someone else? The existence of more than one inference does not *ipso facto* deny the magistrate a choice. He may choose a reasonable inference from among them and his choice is to be sustained on appeal unless it is otherwise proved to be suspect. *United States v. Lucarz, supra. See Spinelli v. United States, supra.*

In our case the magistrate had probable cause to think that Snedeker would have this material in his house because of its value and bulk and because the presence of the property there would not be incriminatory.

■ Considering the facts and reasonable inferences drawn from them, we find that the affidavit did establish probable cause for issuance of the warrant. In this respect, we reverse the Court of Appeals and the trial court.

Both the trial court and the Court of Appeals held that the evidence seized during the second search was inadmissible under the "fruit of the poisonous tree" doctrine. *Nardone v. United States, supra.* The first search was constitutionally sound. We reverse the Court of Appeals and the trial court concerning suppression of evidence seized in the second search.

The State did not take issue with the holding of the Court of Appeals concerning evidence seized in the third search. On this point we do not disturb the ruling of the Court of Appeals.

This cause is remanded to the trial court for further proceedings consistent with this opinion.

IT IS SO ORDERED.

PAYNE, FEDERICI and RIORDAN, JJ., concur.

SOSA, Senior Justice, respectfully dissents.

SOSA, Senior Justice, dissenting.

I respectfully dissent. I would affirm the decisions of the Court of Appeals and the trial court.

I cannot join in the majority opinion because I believe the affidavit for the first search warrant was issued without probable cause. The State concedes that if the first warrant was invalid, the remaining warrants are also invalid as "fruit of the poisonous tree."

Since the majority opinion sets out at length the current law applicable to affidavits for search warrants, I will review briefly only those principles of law which I feel this affidavit fails to meet.

The fourth amendment to the United States Constitution was made applicable to the states through the fourteenth amendment in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). It guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. * * * " U.S. Const. amend. IV. Both the fourth amendment and Article II, Section 10 of the New Mexico Constitution provide that no warrants shall issue, but upon a showing of probable cause. U.S. Const. amend. IV.; N.M. Const., Art. II, § 10.

Probable cause is established by facts and circumstances within the knowledge of the officers, based on reasonably trustworthy information, which are sufficient to warrant a prudent man in believing that the

defendant had committed or is committing a crime. *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *State v. James,* 91 N.M. 690, 579 P.2d 1257 (Ct.App.), *cert. denied,* 91 N.M. 751, 580 P.2d 972 (1978); *State v. Ramirez,* 95 N.M. 202, 619 P.2d 1246 (Ct.App.1980).

A search warrant will issue only on a sworn written statement showing probable cause based on substantial evidence. N.M. R.Crim.P. 17(a) and (f), N.M.S.A.1978 (Repl. Pamp.1980). The standard for reviewing an affidavit is a common sense reading of the affidavit as a whole. *State v. Duran,* 90 N.M. 741, 568 P.2d 267 (Ct.App.1977); *Accord United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

The affidavit in the instant case fails to establish probable cause for the following reasons:

(1) The primary defect in the affidavit is that it does not state why Officer Allred believed the items to be seized were present at John Snedeker's residence at the time the warrant was sought. Mere speculation and inferences are not enough to establish probable cause. *State v. Turkal,* 93 N.M. 248, 599 P.2d 1045 (1979).

(2) The affidavit also fails to state that Officer Allred believed Mr. Snedeker had committed a crime. I agree with the Court of Appeals that nothing in the receipt of property by the president of a university suggests any criminal activity. Even if the statement that the items were not accounted for in university records were accepted, this does not support a conclusion that the items were disposed of improperly.

(3) The test enunciated in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), which determines when the evidence used to support an affidavit may be hearsay, was not met by the affidavit in this case. Certain allegations by Officer Allred appear to be based on hearsay or are otherwise unreliable since no factual basis is given for the allegations. While it may be reasonable to infer that Officer Allred personally inspected the records of the University, the affidavit gives one no factual basis to believe he did so. Also, it fails to state which records were examined, who interpreted them and what information such records would normally contain.

(4) The affidavit fails to state that the items to be seized were ordered for the Safety & Security Department of Western University. It is not implicit in the affidavit that the items were not used in another department of the University.

(5) I agree with the Court of Appeals that the allegation that Mr. Snedeker signed the purchase orders does not show either that he was not authorized to do so or that he converted the items to his own use.

The majority opinion lessens the necessity that a court issuing a warrant inquire as to the factual basis and reliability of hearsay evidence used to support an affidavit for a search warrant. At most, the majority requires "plausible" cause for the issuance of a warrant.

The majority correctly set forth the law, but failed miserably on its application to the facts herein.

For the foregoing reasons, I respectfully dissent.