1997-NMCA-110

948 P.2d 267

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Jimmy Allen PARGAS, Defendant– Appellant.**

No. 17569.

Court of Appeals of New Mexico.

Aug. 7, 1997.

Certiorari Denied Oct. 28, 1997.

Tom Udall, Attorney General, Arthur W. Pepin, Assistant Attorney General, Santa Fe, for Plaintiff–Appellee.

T. Glenn Ellington, Chief Public Defender, Christopher Bulman, Assistant Appellate Defender, Santa Fe, for Defendant–Appellant.

## OPINION

PICKARD, Judge.

1. This case addresses the sufficiency of an affidavit submitted in support of a search warrant. Eleven days after an alleged shooting, the Roswell Police Department obtained a warrant to search Defendant's residence for a handgun. During the search, police officers discovered drugs. Defendant pleaded no contest to one count each of possession of a controlled substance and possession of drug paraphernalia, reserving his right to appeal the trial court's denial of his motion to suppress. The issues on appeal are whether the affidavit submitted to secure the search warrant failed to establish probable cause because (1) the officer's reference to police records was not sufficient to directly establish or allow an inference that Defendant resided at the place to be searched; (2) the affidavit failed to establish why the officer believed that the evidence sought would be discovered at Defendant's residence; and (3) the affidavit was based upon stale information. Because the affidavit in support of the search warrant established probable cause, we affirm.

FACTS

2. The affidavit established the following facts. On July 3, 1995, Chalmarie Dalton (Dalton) and Bobby Garcia (Garcia) reported to the Roswell Police Department that they had been the victims of a shooting. Dalton and Garcia claimed that they were driving their pickup in the area of 19th and Michigan streets in Roswell that evening when Rene Ross (Ross) waved them over. When Dalton and Garcia pulled their vehicle over to the roadside they were approached by Ross. Dalton and Garcia remained in the vehicle as Ross began arguing with them. During the argument, Dalton and Garcia noticed a male passenger exit Ross's vehicle and walk behind their pickup. Garcia began to drive away as the passenger produced a handgun and fired one round at the pickup, missing the vehicle.

3. On July 10, 1995, Detective Larry Montano interviewed Ross. Ross admitted that she had been arguing with Dalton and Garcia on July 3. Ross identified Defendant as the male passenger in her vehicle. However, Ross denied that Defendant had fired a gun at Dalton and Garcia. On July 11, Defendant contacted Detective Montano. Defendant waived his constitutional rights and agreed to answer the detective's questions. Defendant admitted that he was a passenger in Ross's vehicle on the evening of July 3. Defendant confirmed that Ross argued with two people in a pickup. As the argument progressed, Defendant stated that he got out of Ross's vehicle and the pickup then sped off. Defendant denied possessing or firing a handgun at the pickup.

4. On July 12, 1995, Detective Montano showed Dalton and Garcia a photo array. Dalton was able to identify Defendant as the shooter; however, Garcia was not able to

make an identification. Dalton further added that Defendant had been wearing black shiny sunglasses at the time of the shooting. Detective Montano recalled that Defendant was also wearing dark shiny sunglasses during the interview the day before. On July 13, 1995, Detective Montano checked Roswell Police Department records which revealed that Defendant resided at 60 G Street in Roswell.

5. Detective Montano then prepared an affidavit and requested a warrant to search Defendant's residence for any handguns, ammunition, receipts, and black shiny sunglasses. Based upon the information included in the affidavit, the magistrate issued a warrant on July 14, 1995, to search 60 G Street. During the search, police officers were unable to locate any handguns or sunglasses. However, the officers discovered drug paraphernalia and two spoons containing a suspected controlled substance. A second warrant was sought and issued on July 14, 1995, to search for and seize any drugs or drug paraphernalia located at 60 G Street. Three bags of methamphetamine and three shotguns were found during the second search. Police also located a pair of pants in the master bedroom which contained a wallet with Defendant's identification.

6. Defendant was charged with possession of methamphetamine, possession of drug paraphernalia, and being a felon in possession of a firearm. Defendant moved to suppress all evidence found during the two searches of 60 G Street, alleging that both search warrants did not establish probable cause. The district court granted the motion as to the discovery of the shotguns, but denied the motion as to the methamphetamine and drug paraphernalia. The weapons charge was dismissed and thereafter Defendant pleaded no contest to the drug charges, reserving his right to appeal the denial of the suppression motion.

## DISCUSSION

7. When an application for a search warrant is based on an affidavit, the affidavit must contain sufficient facts to enable the issuing magistrate to independently pass judgment on the existence of probable cause. *State v. Cordova*, 109 N.M. 211, 213,

784 P.2d 30, 32 (1989); *State v. Hernandez*, 111 N.M. 226, 227, 804 P.2d 417, 418 (Ct.App. 1990). Probable cause for the issuance of a search warrant must be established from within the four corners of the supporting affidavit. *State v. Barker*, 114 N.M. 589, 590, 844 P.2d 839, 840 (Ct.App.1992). All direct and circumstantial evidence alleged, as well as all reasonable inferences to be drawn from those allegations, should be considered. *State v. Snedeker*, 99 N.M. 286, 290, 657 P.2d 613, 617 (1982). The standard of review on appeal requires us to determine whether, given a common sense reading, the facts detailed in the affidavit support the issuance of the search warrant. *State v. Wisdom*, 110 N.M. 772, 774, 800 P.2d 206, 208, (Ct.App. 1990).

### I. Probable cause to believe 60 G Street was Defendant's residence.

8. Defendant contends as his first point of error that the affidavit failed to establish that he resided at 60 G Street. If a search warrant relates to a residence, and the affiant does not have personal knowledge that a suspect resides at that location, the affidavit must establish or permit a reasonable inference that the suspect lives at that location. *State v. Lovato*, 118 N.M. 155, 158, 879 P.2d 787, 790 (Ct.App.1994). In the application for the search warrant, Detective Montano did not establish that he had personal knowledge that Defendant resided at 60 G Street. Rather, the affidavit reveals that Detective Montano obtained Defendant's address through a search of the Roswell Police Department records.

9. Defendant argues that Detective Montano's failure to specify exactly which records were consulted or to establish the recency of the records negates a reasonable inference that he resided at that address. While Defendant is correct in noting that the affidavit did not establish the date or exact identity of the records, accepting Defendant's argument would violate the rule that facts detailed in an affidavit are to be interpreted "in a common sense and realistic fashion and must not require technical requirements of elaborate specificity." *State v. Donaldson*,

100 N.M. 111, 116, 666 P.2d 1258, 1263 (Ct. App.1983).

10. Given a common sense reading, the facts detailed in Detective Montano's affidavit established probable cause to support the issuance of a search warrant. The affidavit states: "On 7–13–95 Affiant has learned through [r]ecords at the Roswell Police Department that the residence of 60 G Street, is that of [Defendant]." Police officers routinely rely upon information contained in police department records. Police officers regularly consult department records to determine if a suspect has an outstanding warrant or criminal record. It is permissible to conclude that police department records are a reasonable and reliable source of information. The fact that the detective obtained Defendant's address through a search of police department records provided a sufficient basis upon which the district court judge could reasonably infer that Defendant resided at that address.

II. Whether the affidavit established a nexus between Defendant's residence and the handgun.

11. An affidavit in support of a search warrant must contain information as to why police officers believe that the evidence sought is located at the place to be searched. *State v. Herrera,* 102 N.M. 254, 257, 694 P.2d 510, 513 (1985). Defendant contends that the warrant issued in this case is invalid because the affidavit failed to supply a sufficient nexus between his residence and the handgun. For support, Defendant refers to *United States v. Charest,* 602 F.2d 1015 (1st Cir.1979). In *Charest* the court stated that "[c]ommon sense tells us that it is unlikely that a murderer would hide in his own home a gun used to shoot someone. . . . [O]ne of the first things he would do would be to get rid of the gun." *Id.* at 1017 (footnote omitted). Defendant argues that it is unlikely that he too would hold onto a handgun if he had used that weapon in an assault.

12. However, Defendant's argument ignores several factors. The affiant in *Charest* only sought to look for a .38 caliber handgun. *Id.* at 1016. Even if we accepted the *Charest* court's reasoning, Defendant's situation is distinguishable. In this case, police not only sought to search for the handgun allegedly used, but also for any receipts or ammunition related to the handgun and for black shiny sunglasses. Even assuming that Defendant would have disposed of the handgun, it is still reasonable for the court to infer that other evidence pointing to Defendant's ownership of a handgun would exist at his residence— namely the ammunition and receipts. Furthermore, one eyewitness reported that the alleged shooter was wearing black shiny sunglasses at the time of the shooting. Defendant was seen wearing black shiny sunglasses just two days before the affidavit was prepared. If these were the same sunglasses worn at the time of the shooting, obviously Defendant had not disposed of them. Therefore, it is reasonable for a judge to infer that evidence which could identify Defendant as the shooter existed and could be found at his residence.

13. Moreover, we disagree with the court in *Charest* that it is unreasonable to infer that a person involved in a crime will hold onto the weapon. *Charest,* 602 F.2d at 1017. In criticizing *Charest,* the New Hampshire Supreme Court noted that " 'few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime.' " *State v. Faragi,* 127 N.H. 1, 498 A.2d 723, 727 (1985) (quoting *United States v. Green,* 634 F.2d 222, 226 (5th Cir.1981)).

14. Additionally, in *United States v. Steeves,* 525 F.2d 33 (8th Cir.1975), the Eighth Circuit explained:

Obviously, a highly incriminating or consumable item of personal property is less likely to remain in one place as long as an item of property which is not consumable or which is innocuous in itself or not particularly incriminating.

Let it be assumed for purposes of discussion that the defendant in fact robbed the bank on June 22 and that he immediately repaired to his home with his loot and its container, his weapon and his disguise. We think that it may be conceded to the defendant that as late as September 17 there was little reason to believe that any of the bank's money or the money bag

would still be in the home. But, the same concession cannot be made with respect to the revolver, the ski mask, and the clothing. The ski mask and the clothes were not incriminating in themselves, and apart from his prior felony record possession of the pistol was not unlawful in itself or particularly incriminating.

*Id.* at 38 (citations omitted).

15. It is not unreasonable to infer that Defendant would have stored the handgun, receipts, ammunition, or sunglasses at his residence. Such items are not inherently incriminating and are often stored at home. *See Steeves,* 525 F.2d at 38 ("Moreover, people who own pistols generally keep them at home or on their persons."); *State v. Gathercole,* 553 N.W.2d 569, 574 (Iowa 1996) ("[I]t is reasonable to believe that guns will be kept on the subject's person or in his residence."); *State v. Towne,* 158 Vt. 607, 615 A.2d 484, 489 (1992) ("Ordinarily, the home is the first place to look for evidence of a crime.").

16. The likelihood that the gun would be found at Defendant's residence was all the stronger in light of the fact that Defendant was unaware, until July 11, that he was being investigated. *Cf.* 2 Wayne R. LaFave, *Search and Seizure* § 3.7(a), at 350 (3d ed. 1996) ("Even highly incriminating evidence is likely to be retained for some time if the defendant is apparently unaware his criminality has become known[.]"); *State v. Condon,* 72 Wash.App. 638, 865 P.2d 521, 524 (1993) (It is reasonable to infer that the weapon is located at the defendant's residence "especially in cases where the perpetrator is unaware that police have connected him or her to the crime.").

17. For almost a week after the alleged crime Defendant was also unaware that the shooting had been reported to the police. Even after Defendant was questioned by the police, it is reasonable to conclude that he would have held onto the gun and other items. After speaking to the police, Defendant could have assumed that his denial dispelled any suspicion that he was the perpetrator. Moreover, because the shot did not hit the truck, Defendant could have believed that there would be no bullet to match.

18. In *State v. Smith,* 868 S.W.2d 561 (Tenn.1993), the defendant was questioned by police the day after his estranged wife and her two sons were found murdered. *Id.* at 566–67. Although Smith gave the police an alibi, designed to dispel suspicion from him, he became the prime suspect. *Id.* at 571. Eleven days later the police searched the defendant's home for the weapons used in the slayings and for any clothing worn the night of the murder. *Id.* Smith objected to the search, contending that the affidavit failed to establish probable cause because it did not show a nexus between the evidence sought and the place to be searched. *Id.* at 572. The court rejected Smith's argument stating:

> The items being sought, murder weapons such as a gun and ice pick/awl, clothing worn the night of the killing ... were of the type kept at one's residence. It was reasonable to conclude that personal items such as these would have been left at [d]efendant's trailer and would remain there.

*Id.*

19. In *Smith,* the defendant's knowledge that he was a suspect and under investigation did not preclude the court's finding that evidence relating to the murders could be found at his residence. Similarly, Defendant's knowledge that he was identified as Ross's passenger does not invalidate the court's finding of a nexus between his residence and the implements of the alleged assault. Defendant was unaware that any eyewitness had affirmatively identified him as the shooter or that the police had any physical evidence linking him to the alleged assault. Thus, it is reasonable to infer that he would have held onto the items sought in the warrant.

### III. Whether a warrant issued eleven days after the alleged crime is stale.

20. Defendant argues that a search warrant issued eleven days after the alleged commission of a crime failed to establish probable cause that the items sought in the affidavit could be found at his residence. Defendant refers to our previous decision in *Lovato,* 118 N.M. 155, 879 P.2d 787, and

contends that proof of ongoing or continuous activity is necessary to establish probable cause when there is a gap of time between the commission of a crime and the issuance of a search warrant. *Id.* at 157, 879 P.2d at 789.

21. We conclude that Defendant's reliance on *Lovato* is misplaced. In *Lovato,* information in an affidavit concerning heroin buys at a motel was obtained 72 hours before the issuance of a search warrant was sought. *Id.* at 156, 879 P.2d at 788. In determining whether the information in the affidavit was stale so as to preclude a finding of probable cause, this Court considered whether an isolated transaction or a continuing series of events was involved. *Id.* at 157, 879 P.2d at 789.

22. *Lovato* is distinguishable from the present case. The charges in *Lovato* concerned drug trafficking and possession of heroin. *Cf. State v. Powell,* 96 N.M. 569, 571, 632 P.2d 1207, 1209 (Ct.App.1981) (absence of ongoing continuous activity in search warrant application based on drug sales); *State v. Garcia,* 90 N.M. 577, 578–79, 566 P.2d 426, 427–28 (Ct.App.1977) (affidavit alleged ongoing activity to support a warrant to search for heroin and drug paraphernalia). Unlike drugs, which can be consumed or distributed, it is reasonable to infer that Defendant would hold onto a handgun for use at a later time. *See Foster v. State,* 633 N.E.2d 337, 345 (Ind.Ct.App.1994) (rejecting a claim of staleness, noting "[w]e are not reviewing a probable cause determination connected to a search for substances ... which can be expected to be consumed or distributed in the commercial market.").

23. Furthermore, we reject Defendant's claim that the police acted with unjustified delay in allowing a week to pass before questioning Ross about the incident. Garcia and Dalton, the alleged victims, were not injured; nor was any damage sustained by their pickup. It is reasonable to conclude that the police have other more urgent considerations to which to attend. One week is not a significant lapse of time to invalidate the probable cause finding in the affidavit. Moreover, the police acted with great dispatch once information was obtained linking Defendant to the shooting. The day after Dalton identified Defendant as the shooter, Detective Montano drafted the affidavit. The information available to the police at that time was sufficient to establish probable cause. *See* LaFave, *supra,* at 354 ("As correctly pointed out in *Hemler v. Superior Court,* [44 Cal.App.3d 430, 118 Cal.Rptr. 564, 566 (Ct.App.1975)] when a staleness issue is raised there is no need for the authorities to justify the delay or establish an absence of bad faith, for 'that is not the question'; rather, the question is simply whether the facts at hand indicate 'present probable cause.'" (footnote omitted)).

CONCLUSION

24. The district court's order denying Defendant's suppression motion is affirmed.

25. **IT IS SO ORDERED.**

BOSSON and WECHSLER, JJ., concur.