863 P.2d 1052

**STATE of New Mexico,
Plaintiff–Appellant,**

v.

**Gloria GUTIERREZ, Reymundo
Gutierrez, and Johnny Garcia,
Defendants–Appellees.**

**No. 19893.**

Supreme Court of New Mexico.

Oct. 27, 1993.

Tom Udall, Atty. Gen. and Bill Primm, Asst. Atty. Gen., Santa Fe, for plaintiff-appellant.

Sammy J. Quintana, Chief Public Defender and Hugh W. Dangler, Asst. Appellate Defender, Santa Fe, for defendants-appellees.

William Carpenter, Albuquerque, for amicus N.M. Trial Lawyers.

Charles W. Daniels, Albuquerque, for amicus N.M. Criminal Defense Lawyers.

Steven D. Ecker, New Haven, CT, for amicus Nat. Ass'n of Criminal Defense Lawyers.

OPINION

RANSOM, Chief Justice.

We granted the State's petition for a writ of certiorari to review an opinion of the Court of Appeals that affirmed the district court's order suppressing certain

evidence obtained through unannounced entry of defendants' residence as authorized in a search warrant. *See State v. Gutierrez*, 112 N.M. 774, 819 P.2d 1332 (Ct.App.1991). The issue presented to this Court is whether evidence obtained by virtue of an invalid search warrant nevertheless may be admitted under the exclusionary rule's "good-faith" exception as articulated by the United States Supreme Court in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). We agree with the Court of Appeals that the good-faith exception is incompatible with the guarantees of the New Mexico Constitution that prohibit unreasonable searches and seizures and that mandate the issuance of search warrants only upon probable cause. Therefore, we affirm.

*Facts and proceedings.* On August 4, 1989, the district judge issued a warrant authorizing the search of an apartment in Albuquerque for methamphetamine and other controlled substances, along with drug distribution paraphernalia and evidence of the purchase and sale of controlled substances. In his own hand near the bottom of the page, the district judge wrote that "unannounced entry is authorized for the protection of the officers and for the preservation of evidence."

Officer Carla Gandara swore to the following facts contained in the affidavit supporting her request for the warrant: A reliable informant reported that Reymundo and Gloria Gutierrez were selling "crank", or methamphetamine, from the apartment. Shortly before executing the affidavit, Officer Gandara supervised the informant's purchase of methamphetamine from the apartment. In addition, the police had received complaints from neighbors about suspected drug activity in the apartment and had observed frequent pedestrian and vehicular traffic of the type "consistent with persons who either buy or sell drugs."

Officer Gandara requested that the warrant authorize unannounced entry and submitted the following recital in support of this request:

> Affiant has learned through previous investigations and search warrants that when a search warrant for drugs is announced, the persons in possession of the drugs often destroyed the evidence before officers can enter. This is usually done by either swallowing or flushing the evidence. Based on this information, affiant requests that the search warrant be considered a no-knock warrant.[1]

The affidavit contained no particularized showing that the defendants were apt to destroy evidence. Moreover, although the warrant stated that no-knock entry was authorized both to preserve evidence and for officer safety, concerns for officer safety were absent from the affidavit. Officer Gandara testified at the suppression hearing that the warrant had been reviewed by a representative of the district attorney's office.

On August 14, 1989, Officer Gandara, Sergeant Ray Ortiz, Detective Shawn, and three other Albuquerque police officers executed the warrant.[2] The officers did not announce their presence and purpose prior to entry. Officer Gandara, leading the raid, opened the door and ran into the apartment shouting, "Police, down!"[3] The other officers followed her into the apartment. She then ran directly to the back of the apartment. The search recovered eleven bags of methamphetamine from the kitchen table, paraphernalia for distribution, and a portion of the money used for

---

1. Warrants that authorize unannounced entry by executing officers have come to be known as "no-knock" warrants.

2. It appears that all the officers involved were members of the Field Services Bureau, Valley Area Impact Command (or Team), Narcotics Unit of the Albuquerque Police Department.

3. Apparently, there was a screen door and an entry door. Some conflict arose at the suppression hearing as to whether the screen door was open, unlocked, both, or neither. Johnny Garcia testified that both the screen door and the entry door were closed and locked. Officer Gandara testified that the screen door was closed but unlocked, and that the entry door was open. Except for Garcia's testimony at the suppression hearing that he was knocked to the floor when Officer Gandara burst into the apartment, there is no claim that the officers used unreasonable force after entry.

the informant's controlled purchase. Nothing in the record suggests that the officers discovered weapons of any sort.

Reymundo and Gloria Gutierrez, husband and wife, and Gloria's son, Johnny Garcia, all resided in the apartment and were present during the search. They were arrested and a grand jury indicted them on three counts: possession of a controlled substance with intent to distribute under NMSA 1978, Section 30–31–22(A) (Repl. Pamp.1989), conspiracy to commit possession of a controlled substance with intent to distribute under NMSA 1978, Sections 30–28–2, 30–31–22(A) (Repl.Pamp.1984), and possession of drug paraphernalia under NMSA 1978, Section 30–31–25.1(A) (Repl.Pamp.1989).

Defendants moved to suppress the evidence recovered from the apartment during the search, asserting it was obtained in violation of the Fourth Amendment to the United States Constitution and Article II, Section 10 of the New Mexico Constitution. They challenged both the sufficiency of the showing of probable cause and the propriety of unannounced entry. The State, citing *Leon*, urged adoption of a good-faith exception to the exclusionary rule under the Fourth Amendment and Article II, Section 10. In granting the defendants' motions to suppress, the trial court explained:

1. The Fourth Amendment and the New Mexico Constitution require that for a search to be valid it must be "reasonable". To be reasonable, the officer(s) serving the warrant must "knock and announce", unless sufficient exigent circumstances exist to forgo this requirement.

2. Most jurisdictions do not allow a predetermination of these exigent circumstances. The officer serving the warrant must make that determination at the time the warrant is served.

3. New Mexico has not adopted the "good-faith exception" to the requirement of probable cause or exigent cir-

cumstances. If such were the case, under the particular circumstances of this case, the "good-faith exception" would apply.

4. Sufficient exigent circumstance[s] were not articulated at the hearing on this motion to allow a "no-knock entry".

The court entered no findings and drew no conclusions on probable cause.

Within ten days, the State appealed the suppression order as authorized by NMSA 1978, Section 39–3–3(B)(2) (Repl.Pamp. 1991). The Court of Appeals affirmed. Writing for a two-judge majority, Judge Chavez held that the New Mexico Constitution does not embody a good-faith exception to the rule requiring exclusion of evidence seized pursuant to a constitutionally deficient search. *Gutierrez*, 112 N.M. at 780, 819 P.2d at 1338. The Court criticized the *Leon* Court's cost-benefit analysis of the exclusionary rule, stating that the costs of the rule are exaggerated. *Id.* at 778–80, 819 P.2d at 1336–38. In addition, the Court stated that the good-faith exception swallowed the constitutional requirement of probable cause. *Id.* at 780, 819 P.2d at 1338. Judge Bivins dissented and suggested a case-by-case adoption of a good-faith exception to the exclusionary rule. *Id.* at 782, 819 P.2d at 1340. Judge Bivins took issue with the majority's preoccupation with the sanctity of the probable cause requirement. He noted that the warrant was deemed invalid not because of lack of probable cause, but because of the nature of the entry it authorized. *Id.* at 784, 819 P.2d at 1342.

*Preliminary discussion—invalidity of no-knock warrant gives rise to good-faith exception issue.* We first consider whether we are faced with a question that is real or one that is hypothetical. On appeal, the State assumes, and apparently would have us assume, that the trial court declared the warrant to be invalid.[4] Although the trial

---

4. In its brief in chief before the Court of Appeals, the State conceded that "The warrant was not supported by a particularized showing of facts specific to these defendants indicating that they personally would be likely to flush their

drugs down the toilet, or otherwise dispose of them, or use weapons to endanger themselves and the police." In addition, the State "acknowledge[d] that such specific facts did not become apparent to the officers at the time of

court did not expressly declare the warrant to be invalid, it noted that most jurisdictions do not allow the predetermination of exigent circumstances. The State, on the other hand, assumes that the warrant was invalid because facts justifying unannounced entry were not established with particularity in the affidavit. The State thus implies that, upon a proper factual showing, unannounced entry may be authorized by warrant. We have considered the validity of predetermination of exigent circumstances but expressly withhold any statement of an opinion in that regard. We see the issue on appeal as being founded on the absence of particularized facts in the affidavit.

The widespread use of no-knock warrants that was revealed at the hearing below,[5] their potential impact on important interests of both the state and the public, and the unsettled issue of the legality of their use under the law of this state[6] require that we one day address the validity of a judicial predetermination of necessity for unannounced entry. It would be inappropriate, however, to set forth here a position on a point not discussed by the parties in their briefs.

Suffice to say, we believe the issue is not whether a judicial officer has the authority or power to authorize no-knock entry, since such authority is seemingly present in the inherent powers of judicial officers; rather it is the wisdom of judicial determination of the reasonableness of police conduct that has yet to occur. That is, the issue is whether to favor prescreening of the reasonableness of the officer's conduct over after-the-fact judicial review of such conduct. Prescreening of conduct is a burdensome and rare phenomenon in our legal system. Our system tends to favor after-the-fact, adversarial judicial review of police conduct, rather than ex-parte prescreening. The warrant process is one notable exception. There we require a judicial officer to review, in advance, whether probable cause is present to justify police action. We often have stated that we require such prescreening because it interjects a detached and neutral decisionmaker between the police and the person to be searched. *See, e.g., State v. Cordova*, 109 N.M. 211, 212, 784 P.2d 30, 31 (1989). But the constitutional requirements of probable cause and reasonableness are distinct. Probable cause serves as the *justification* for mobilizing police action. Once probable

---

execution of the warrant." For "the purpose of argument," the State assumes that the "warrant was invalid, [and argues that] the exclusionary rule should not be applied because the police acted on the basis of an objectively reasonable good faith belief that the warrant was valid." At oral argument before this Court, counsel for the State stated that he did not concede that the warrant was invalid; rather, he was not challenging the finding of invalidity.

5. Detective Shawn testified that in the eighteen months he had spent with the Valley Impact Team, ninety-five percent of the approximately 100 warrants he had executed were no-knock warrants. When asked whether evidence ever had been destroyed during a knock and announce search, Detective Shawn replied, "We haven't done any warrants where we knock and announce first. On several occasions the stuff has been destroyed, yes, but none that we've knocked and announced."

The following colloquy elicited by Mr. Davis, counsel for defendants, highlights Officer Gandara's experiences with no-knock entry:

Davis: Of the 20 or more search warrants that you have prepared the affidavits for, have you executed those warrants as well?

Gandara: Yes, I have.
Davis: Of those warrants, do you know how many of those were no-knock warrants?
Gandara: I would say maybe half of them.

6. The following testimony elicited at the suppression hearing underscores the unsettled nature of the legal issue:

Court: Is it your understanding that as long as a judge says it's okay no matter what occurs that the ...
Shawn: Yes.
Court: That the home ... that you've got sort of carte blanche to break into the house?
Shawn: Yes. If exigent circumstances are either suspected or arise on your arrival, I understand that you don't need it specifically, but ...
Court: Let me tell you something just for your own information here. That's wrong.
Shawn: Okay.
Court: I think somebody ... the D.A.'s office or somebody needs to get with you and explain that to you. That's not the law in New Mexico.
Shawn: I have since learned that. I have left the unit and since learned that, but the information I got it from was a Judge.

cause has been determined by a detached and neutral judicial officer, the executing officers' right to enter the premises matures. They must enter the premises reasonably, which in some cases may require force. The constitutional requirement of reasonableness governs the *conduct* of the search, and traditionally we have relied on after-the-fact, adversarial judicial review of the actual conduct for constitutional regulation of police entries.

The inevitable result of prescreening of police conduct is that officers may rely on the judge's determination of the need for unannounced entry. The conduct of the search will be influenced by the judicial officer's authorization, and judicial review will be deflected from the reasonableness of the search to the reasonableness of the judicial officer's authorization of unannounced entry. Moreover, prescreening is likely to hinder law enforcement. Officers who are unsuccessful in obtaining a no-knock warrant but who are justified at the scene of the search to enter without announcement may be hesitant, to the detriment of their safety (and that of the occupants), to enter unannounced.

We recognize that there may be circumstances in which officers know in advance that unannounced entry may be justified and those cases speak most strongly to advance authorization. At the very least, that authorization would assist after-the-fact review of the reasonableness of the method of entry by establishing well in advance the facts justifying the method of entry. In those cases, however, officers can begin to document the factors justifying the reasonableness of forcible, unannounced entry just as well by making such facts part of the case file. From the standpoint of after-the-fact review, prior authorization simply may be unnecessary, but we defer our answer to this question until it is raised and fully briefed in another case. Even were we to adopt a general rule against judicial predetermination, excep-

tional facts well might justify exceptions to a general prohibition.

We accept the State's suggestion that no exigencies were particularized in the affidavit for the warrant and, were the issue before us, we would hold that the no-knock warrant was invalid for want of particularized facts in the affidavit. There is no contention that the officers perceived any exigencies justifying unannounced entry irrespective of the warrant's no-knock authorization. It follows from the invalidity of the warrant and the absence of perceived exigencies that we are not presented with an unfounded request for an advisory opinion on constitutional law.[7]

*Good-faith exception to the exclusionary rule.* The issue squarely presented by the opinion of the Court of Appeals and by the State in its brief in chief is whether the New Mexico Constitution contemplates a good-faith exception to the exclusionary rule. The Court of Appeals rejected the federal good-faith exception as a matter of state constitutional law. *Gutierrez,* 112 N.M. at 780, 819 P.2d at 1338. We first examine why our constitution requires exclusion of illegally obtained evidence. Only then do we determine the question at issue here: whether the exception articulated in *Leon* may coexist with our rule of exclusion.

*—The exclusionary rule under the New Mexico Constitution.* Consideration of the *Leon* good-faith exception can be undertaken only in the context of the history and application of the exclusionary rule prior to *Leon.* We reiterate that in exercising our constitutional duty to interpret the organic laws of this state, we independently analyze the New Mexico constitutional proscription against unreasonable searches and seizures. In so doing, we seek guidance from decisions of the United States Supreme Court interpreting the federal search and seizure provision, from the decisions of courts of our sister states interpreting their correlative state constitution-

---

7. We note, however, that the objective good faith of the officers executing the warrant is a different question when based on a faulty affidavit than when based on the legal impropriety of *any* no-knock warrant. The faulty affidavit question is one we would prefer to have had the trial court decide in the first instance.

al guarantees, and from the common law. However, when this Court cites federal opinions, or opinions from courts of sister states, in interpreting a New Mexico constitutional provision we do so not because we consider ourselves bound to do so by our understanding of federal or state doctrines, but because we find the views expressed persuasive and because we recognize the responsibility of state courts to preserve national uniformity in development and application of fundamental rights guaranteed by our state and federal constitutions.

*—The federal exclusionary rule.* The federal exclusionary rule first evolved as a rule of constitutional dimension, but has been steadily reinterpreted so that today the rule stands as a deterrent safeguard of only minimal constitutional significance. The exclusionary rule saw its genesis in *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), when the Court, in vivid, but oblique language, explained its rationale for excluding from trial evidence obtained in violation of the Fourth Amendment: [8]

> If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the 4th Amendment, declaring the right to be secure against such searches and seizures, is of no value, and so far as those thus placed are concerned, might as well be stricken from the Constitution.... To sanction such proceedings would be to affirm by judicial decision a manifest neglect, if not an open defiance, of the prohibitions of the Constitution, intended for the protection of the people against such unauthorized action.

*Weeks,* 232 U.S. at 393–94, 34 S.Ct. at 344–45.

In *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), Justice Holmes rejected the government's contention that *Weeks* and the Fourth Amendment protect only physical possession of the documents and do not immunize the defendant from prosecution based on information obtained in the search.

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.... If knowledge of [the unconstitutionally acquired facts] is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed.

*Silverthorne,* 251 U.S. at 392, 40 S.Ct. at 183.

Eight years later, Chief Justice Taft, writing for the majority in *Olmstead v. United States,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), *majority opinion overruled by Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), restated the *Weeks* rule in language proclaiming its constitutional basis:

> The striking outcome of the *Weeks* case and those which followed it was the sweeping declaration that the Fourth Amendment, although not referring to or limiting the use of evidence in courts, really forbade its introduction if obtained by government officers through a violation of the Amendment.

*Olmstead,* 277 U.S. at 462, 48 S.Ct. at 567.

The last suggestion that the exclusionary rule was of constitutional dimension appeared in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The Court held that, as an "essential part of both the Fourth and Fourteenth Amendments," the exclusionary rule is binding upon the states. *Id.* at 657, 81 S.Ct. at 1692. In so doing, the Court returned to the *Weeks* rationale for what was to be the last time. Describing the basis of the *Weeks* rule, the Court in *Mapp* stated:

---

**8.** The Fourth Amendment provides:

 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

 U.S. Const. amend. IV.

There are in the cases of this Court some passing references to the *Weeks* rule as being one of evidence. But the plain and unequivocal language of *Weeks*—and its later paraphrase in *Wolf*—to the effect that the *Weeks* rule is of constitutional origin, remains entirely undisturbed.

*Mapp,* 367 U.S. at 649, 81 S.Ct. at 1688.

Beginning with *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), *overruled by Mapp,* and continuing through *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), the Court gradually moved away from the constitutional theory of the exclusionary rule in *Weeks* and *Mapp* to a view premised on deterrence, in which practical considerations of the costs and benefits of the rule govern its scope and application. *See* Yale Kamisar, *Does (Did) (Should) the Exclusionary Rule Rest on a "Principled Basis" Rather Than an "Empirical Proposition"?,* 16 Creighton L.Rev. 565, 627–45 (1983) (explaining development of deterrence rationale and cost-benefit analysis).

In *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), these deterrence theories were comprehensively developed. California police officers obtained and executed a search warrant that later was deemed to be invalid for lack of probable cause. The Court held that when an officer's reliance on a warrant that is later invalidated is objectively reasonable, exclusion of the evidence is not necessary. *Id.* at 922, 104 S.Ct. at 3420. The operative question under *Leon* is not whether the officer subjectively believed in the validity of the warrant, but whether it was understandable for a reasonably well-trained officer, conversant in "what the law prohibits," *id.* at 919 n. 20, 104 S.Ct. at 3418 n. 20, to think that the warrant application comported with the requirements of the Fourth Amendment:

> [O]ur good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances—including whether the warrant application had previously been rejected by a different magistrate— may be considered.

*Id.* at 922 n. 23, 104 S.Ct. at 3420 n. 23.

The Court described several instances in which the exception would not apply:

> Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. The exception ... will also not apply in cases where the issuing magistrate wholly abandoned his judicial role.... Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient— *i.e.,* in failing to particularize the place to be searched or the things to be seized— that the executing officers cannot reasonably presume it to be valid.

*Id.* at 923, 104 S.Ct. at 3420 (citations omitted) (quoting *Brown v. Illinois,* 422 U.S. 590, 610–11, 95 S.Ct. 2254, 2265–66, 45 L.Ed.2d 416 (1975) (Powell, J., concurring in part)).

The *Leon* majority founded its exception on several critical premises derived from the post-*Mapp* cases. First, the Court was quick to dispel any notion that the exclusionary rule is a "necessary corollary of the Fourth Amendment." 468 U.S. at 905, 104 S.Ct. at 3411. Despite statements to the contrary in *Olmstead,* 277 U.S. at 462– 63, 48 S.Ct. at 567, and *Mapp,* 367 U.S. at 651, 655–57, 81 S.Ct. at 1689, 1691–93, the Court reiterated the position it took in *Calandra* that the exclusionary rule operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Leon,* 468 U.S. at 906, 104 S.Ct. at 3411 (quoting *Calandra,* 414 U.S. at 348, 94 S.Ct. at 620). Responding

to concerns that admission of illegally seized evidence would sully the integrity of the judiciary, the Court also stated that "the use of fruits of a past unlawful search or seizure 'work[s] no new Fourth Amendment wrong.'" *Leon,* 468 U.S. at 906, 104 S.Ct. at 3411 (quoting *Calandra,* 414 U.S. at 354, 94 S.Ct. at 623). The Court then laid the cornerstone of the *Leon* exception: The exclusionary rule "is designed to deter police misconduct rather than to punish the errors of judges and magistrates." 468 U.S. at 916, 104 S.Ct. at 3417.

According to the Court, the preeminent (if not the sole) policy driving the interpretation of the exclusionary rule is whether application of the rule in the case at bar would specifically deter the particular police and judicial officers; should suppression of the evidence not have that effect, the exclusionary rule will not apply.

If exclusion of evidence obtained pursuant to a subsequently invalidated warrant is to have any deterrent effect, therefore, it must alter the behavior of individual law enforcement officers or the policies of their departments.

. . . .

We have frequently questioned whether the exclusionary rule can have any deterrent effect when the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment.... But even assuming that the rule effectively deters some police misconduct and provides incentives for the law enforcement profession as a whole to conduct itself in accord with the Fourth Amendment, it cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity.

. . . .

This is particularly true, we believe, when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope. In most such cases, there is no police illegality and thus nothing to deter. It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. "[O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law." Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.

*Leon,* 468 U.S. at 918–21, 104 S.Ct. at 3418–20 (footnotes and citations omitted) (quoting *Stone v. Powell,* 428 U.S. 465, 498, 96 S.Ct. 3037, 3054, 49 L.Ed.2d 1067 (1976) (Burger, C.J., concurring)).

—*New Mexico search and seizure jurisprudence.* Prior to *Mapp,* New Mexico, like many jurisdictions, subscribed to the rule that the means by which the evidence is obtained does not render it inadmissible. *See State v. Dillon,* 34 N.M. 366, 375, 281 P. 474, 478 (1929) (refusing to adopt the federal exclusionary rule of *Weeks* ); *see also Breithaupt v. Abram,* 58 N.M. 385, 388–89, 271 P.2d 827, 829 (1954) (not so holding, but noting that United States Supreme Court in *Wolf* held the due process clause was not violated by admission in state court of evidence seized in violation of Fourth Amendment), *aff'd,* 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957).

In *Dillon,* this Court determined that the New Mexico Constitution does not require exclusion of illegally obtained evidence. The Court affirmed the trial court's order denying defendant's motion to suppress evidence seized under a legally deficient search warrant. According to the Court, neither the constitutional prohibition of unreasonable searches and seizures, N.M. Const. art. II, § 10, nor the constitutional prohibition against compulsory self-incrimination, N.M. Const. art. II, § 15, barred admission of the evidence. The Court reasoned:

It appears to us that the correct solution of the problem depends on a determination of the object sought to be at-

tained by the people in adopting the guaranty against unreasonable searches and seizures. If the object was to "prevent violations of private security in person and property and unlawful invasion of the sanctity of the home of the citizen by officers of the law, acting under legislative or judicial sanction, and to give remedy against such usurpations when attempted," then the violation of the citizen's constitutional right has been completed with the completion of the invasion, and the evidence so obtained stands on the same basis as any other evidence obtained unlawfully. If, on the other hand, the object was to guarantee the citizen against conviction by evidence obtained through an unreasonable search and seizure, the evidence so obtained stands on an altogether different footing, and its admission becomes the gist of the violation, and the violator would be, not the officer who made search, but the judge who admits the evidence.

*Dillon,* 34 N.M. at 371, 281 P. at 476 (citation omitted) (quoting *Adams v. New York,* 192 U.S. 585, 598, 24 S.Ct. 372, 375, 48 L.Ed. 575 (1904)). Choosing the rationale first posited, the Court expressed consternation that the exclusionary rule benefitted only the guilty:

> [W]e have been brought to the conclusion that the object of the constitutional guaranty against unreasonable searches and seizures is not to prevent the use of a citizen's private papers as evidence against him, but to make unlawful the governmental invasion of his premises and privacy and the taking of his goods, irrespective of what is done with or the use made of them. The innocent could derive no benefit from an interpretation of the constitutional guaranty into the rule of evidence contended for, and surely the guilty are not entitled to, and were never intended to be given a benefit and protection which are not shared equally by the innocent.

*Dillon,* 34 N.M. at 375, 281 P. at 478. Again focusing on guilt or innocence, the Court saw little remedial justification for the rule:

> When called upon to determine the guilt or innocence of an accused person, we need the evidence. It seems illogical to suppress it, either as compensation for a trespass, for which the law affords another remedy, or as a punishment for "dirty business" by court officials, whom the courts have other means of disciplining. If other remedies are required, let the Legislature devise them.

*Id.* at 377, 281 P. at 479. This Court never returned to the issue after *Dillon.*

New Mexico search and seizure jurisprudence after *Mapp* can be characterized by its grudging acceptance of the federal exclusionary rule and, until recently, by the absence of independent analysis of the New Mexico constitutional proscription of unreasonable searches and seizures. In two of the first three search and seizure cases to reach this Court after *Mapp,* we acknowledged that *Mapp* would require suppression of evidence illegally seized, but in each case determined that suppression was not required since the searches were constitutionally reasonable under applicable federal standards. *See State v. Garcia,* 76 N.M. 171, 174–75, 413 P.2d 210, 212–13 (1966) (holding it is not a search to observe that which occurs in a public place); *State v. Lucero,* 70 N.M. 268, 275, 372 P.2d 837, 842 (1962) (no suppression under federal rule that a warrant is not required for the search of a movable vehicle if officers have reasonable cause to believe that it contains contraband); *see also State v. Rascon,* 89 N.M. 254, 261, 550 P.2d 266, 273 (1976) ("[W]e have no intention of expanding upon the suppression of evidence one whit further that is required of us."). *But see State v. Miller,* 76 N.M. 62, 65–68, 412 P.2d 240, 241–44 (1966) (suppressing evidence when complaint upon which arrest warrant was based was deficient).

In comparison, in *State v. Herrera,* 102 N.M. 254, 694 P.2d 510, *cert. denied,* 471 U.S. 1103, 105 S.Ct. 2332, 85 L.Ed.2d 848 (1985), the Court held a search illegal under both the state and federal constitutions but deemed the admission of the illegally obtained evidence harmless and affirmed the

conviction. In examining the legality of the search, the Court relied exclusively upon New Mexico precedent and at no point signaled a departure from federal law. The Court implied that, but for the harmlessness of the error, admission of the illegally seized evidence was erroneous as a matter both of state and federal *constitutional* law. *Id.* at 258–59, 694 P.2d at 514–15. The Court went no further to explain why the New Mexico Constitution would forbid use of the evidence.

Additionally, without reference to *Dillon*, several cases decided by our Court of Appeals have intimated that Article II, Section 10 of our constitution requires exclusion. For example, in *State v. Richerson*, 87 N.M. 437, 441, 535 P.2d 644, 648 (Ct. App.), *cert. denied*, 87 N.M. 450, 535 P.2d 657 (1975), the Court of Appeals held that admission of the results of an involuntary blood test not made after an arrest violates both the Fourth Amendment and Article II, Section 10 of the New Mexico Constitution. *See also State v. Lewis*, 80 N.M. 274, 277–78, 454 P.2d 360, 363–64 (Ct.App.1969) (citing only New Mexico Constitution and suppressing evidence because warrant failed to show probable cause), *overruled on other grounds by State v. Nemrod*, 85 N.M. 118, 509 P.2d 885 (Ct.App.1973); *Boone v. State*, 105 N.M. 223, 227, 731 P.2d 366, 370 (1986) (citing *Lewis*). These cases, however, do not independently explore the reach of Article II, Section 10.

For the most part, during the period since *Mapp*, when the United States Supreme Court reinterpreted the exclusionary rule this Court embraced the federal exceptions and the Supreme Court's evolving de-emphasis of the Fourth Amendment. Thus, in *State v. Snedeker*, 99 N.M. 286, 657 P.2d 613 (1982), the Court reversed the trial court's finding that an affidavit for a search warrant did not establish probable cause. In so doing, the Court reiterated, in dictum, the views of the United States Supreme Court on the purposes of the federal exclusionary rule: "[T]he concept of 'preserving the integrity of the judicial process ... has limited force as a justification for the exclusion of highly probative evidence.'

... The primary justification for the exclusionary rule then is the deterrence of police conduct that violates Fourth Amendment rights." *Id.* at 288–89, 657 P.2d at 615–16 (quoting *Stone v. Powell*, 428 U.S. 465, 485, 486, 96 S.Ct. 3037, 3048, 3048, 49 L.Ed.2d 1067 (1976)). The Court applied the Supreme Court's cost-benefit analysis of Fourth Amendment suppression claims: "The public interest in the determination of the truth at trial must be weighed against the incremental benefit of applying the rule." *Snedeker*, 99 N.M. at 289, 657 P.2d at 616. Because *Snedeker* only expounds our view of the Fourth Amendment underpinnings of the federal exclusionary rule, however, it offers little guidance to our review of Article II, Section 10.

Recently this Court has demonstrated a willingness to undertake independent analysis of our state constitutional guarantees when federal law begins to encroach on the sanctity of those guarantees. In *State v. Cordova*, 109 N.M. 211, 784 P.2d 30 (1989), this Court marked its first departure from federal Fourth Amendment jurisprudence by rejecting the totality of the circumstances analysis of probable cause announced in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). We established that the requirement of Article II, Section 10 that "no warrant ... shall issue ... without a written showing of probable cause, supported by oath or affirmation," was served better by the two-pronged test of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). We based our conclusion in part on our belief that the two-pronged test reflected "principles ... firmly and deeply rooted in the fundamental precepts of [our] constitutional requirement that no warrant issue without a written showing of probable cause" and in part on our observation that the rigid application of the two-pronged test that prompted the Supreme Court to change its course in *Gates* was not present in New Mexico. *Cordova*, 109 N.M. at 216, 784 P.2d at 35.

*—Analysis of Article II, Section 10.— Framers' intent.* The New Mexico Constitution was drafted at a convention meeting in Santa Fe from October 3 through November 21, 1910. The constitution was approved by the voters on January 21, 1911, and became effective January 6, 1912, upon New Mexico's admission as a state. *See* Robert W. Larson, *New Mexico's Quest for Statehood 1846–1912* 272–304 (1968); *Proceedings of the Constitutional Convention of the Proposed State of New Mexico* (1910). We have reviewed the proceedings of the constitutional convention and are aware of no direct evidence establishing what the framers believed to be the scope, meaning, and effect of Article II, Section 10. Unlike the relatively clear evidence that American colonists were concerned with abusive British search and seizure practices, and the recorded debate and discussion by the federal framers concerning the Fourth Amendment, the transcriptions of the New Mexico Constitutional Convention of 1910 contain no debate or discussion of the New Mexico search and seizure provision.

British abuses of individual liberty carried out by execution of the general warrant and the writ of assistance that appear to have prompted response in the Fourth Amendment certainly are relevant to our interpretation of Article II, Section 10— indeed, it is likely that such concerns still played a role in drafting Article II, Section 10 in 1910. *See* Potter Stewart, *The Road to Mapp v. Ohio and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search–and–Seizure Cases,* 83 Colum.L.Rev. 1365, 1369–72 (1983) (discussing early colonial repugnance to general warrants and writs of assistance); Kamisar, *supra,* at 571–79 (discussing sources of the dual concerns embodied in the Fourth Amendment: abolishment of general warrants and prevention of unreasonable searches and seizures). However, we would be blind to the progress of our national history and to the historical context in which New Mexico achieved statehood to label such factors the sole or primary indicia of our framers' intent. At the time the New Mexico Constitution was adopted in 1911, over 100 years had elapsed since the national framers embodied their concerns in the Fourth Amendment. In 1911, the general warrant and writ of assistance had all but disappeared from the American landscape. While it is likely that the framers of the New Mexico Constitution still bore in mind the threats to individual liberty brought about by the general warrant and writ of assistance, it is just as likely that the framers simply adopted Article II, Section 10 after having given little new contemplation to its scope, meaning, or effect. Indeed, that hypothesis is supported by the dearth of debate or discussion in the constitutional proceedings and by the absence in early twentieth-century New Mexico of any evidence of the same abusive police and governmental practices that plagued American colonists.

*—Search and seizure law in 1911.* Also relevant to our interpretation of Article II, Section 10 is the milieu from which the New Mexico search and seizure provision emerged. We are aware of no territorial judicial opinions concerning search and seizure law antedating the New Mexico Constitution. Through the latter part of the nineteenth century and into the first decade of the twentieth century, the prevalent view, often attributed to *Commonwealth v. Dana,* 43 Mass. (2 Met.) 329 (1841), was that a trial court would not pause to consider collateral issues concerning the legality of the method by which evidence was seized.

Against the great body of precedent in place at the turn of the century, we must consider the countervailing factors—any case law to the contrary and the trend in legal discourse. At the time the text of the New Mexico Constitution was under consideration, at least one federal district court and two state supreme courts had held inadmissible evidence obtained in violation of the constitutional right to be free from unreasonable searches and seizures. It was, perhaps, the sweeping language in *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), that planted the seeds of the exclusionary rule. Admittedly, *Boyd* concerned the validity of a

subpoena issued pursuant to statute that required one accused of violating certain revenue laws to produce evidence sought by the government in the forfeiture proceeding and that deemed a refusal to so produce a confession of the allegations set forth in the subpoena. *Boyd*, 116 U.S. at 619–20, 6 S.Ct. at 526–27. But, the Court reasoned that such proceedings violated both the Fourth and Fifth Amendments:

> Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods, is within the condemnation of that judgment. In this regard the Fourth and Fifth Amendments run almost into each other.

*Boyd*, 116 U.S. at 630, 6 S.Ct. at 532.

In *United States v. Wong Quong Wong*, 94 F. 832 (D.Vt.1899), the government instituted deportation proceedings against two Asian men. At the hearing, the government produced letters, written by the men, that purported to contradict their claims to United States citizenship. The letters were obtained by unlawful search and seizure. The district court reversed and in unequivocal language reasoned that exclusion of the letters was a necessary concomitant of, and indeed implicit in, the Fourth Amendment right to be free from unreasonable searches and seizures. According to the court, to deny exclusion would trivialize the rights guaranteed by the Fourth Amendment and the Fifth Amendment right against self-incrimination:

> The opening of the envelopes, and taking these letters from them, was a seizure of papers of the appellants that was unreasonable and contrary to the spirit of these amendments; and such papers, procured in that way, cannot be used in evidence against persons from whom they are procured without violating the protection afforded by the amendments to all persons in this country. It has been said that the manner of obtaining such evidence, whether by force or fraud, does not affect its admissibility;

> but these constitutional safeguards would be deprived of a large part of their value if they could be invoked only for preventing the obtaining of such evidence, and not for protection against its use.

*Wong Quong Wong*, 94 F. at 833–34 (emphasis added).

Similarly, the Supreme Court of Vermont, in *State v. Slamon*, 73 Vt. 212, 50 A. 1097 (1901), excluded from trial evidence obtained in violation of the Vermont constitutional guarantee that its citizens be free from unreasonable searches and seizures. At trial on a charge of larceny the state sought to introduce a letter that was unlawfully obtained from the defendant. *Id.*, 50 A. at 1098. In a terse paragraph, the court rejected the *Dana* rule and held that violation of the state search and seizure guarantee rendered the letter inadmissible:

> It is generally considered immaterial how a paper passes into the possession of the one offering it in evidence. But this rule is subject to another rule which is applicable,—that, when a party invokes the constitutional right of freedom from unlawful search and seizure, the court will take notice of the question and determine it.

*Id.*, 50 A. at 1098. Apparently, the court viewed violation of the state search and seizure provision to require exclusion. The principle articulated in *Slamon* remains the law in Vermont today. *See State v. Badger*, 141 Vt. 430, 450 A.2d 336, 348–50 (1982) (reaffirming *Slamon*).

Two years later, in *State v. Sheridan*, 121 Iowa 164, 96 N.W. 730 (1903), officers obtained a search warrant in a manner conceded to violate the state constitution and in searching the defendant's home found potentially incriminating evidence. The Iowa Supreme Court held that evidence obtained in violation of the Iowa search and seizure provision is to be excluded from trial:

> "[A] party to a suit can gain nothing by virtue of violence under the pretense of process, nor will a fraudulent or unlawful use of process be sanctioned by the courts. In such cases parties will be

restored to the rights and positions they possessed before they were deprived thereof by the fraud, violence, or abuse of legal process." ... The search was for the mere purpose of securing evidence by the invasion of the private residence of the defendant. The sacredness of his person against such an act is protected by no higher or stronger guaranty than that of his home, his papers, and effects.

*Sheridan*, 96 N.W. at 731 (quoting *State v. Height*, 117 Iowa 650, 91 N.W. 935, 939–40 (1902)).

The court responded to the *Dana* rule and explained the basis for exclusion:

> It is said, however, that the court will not inquire how the offered evidence has been procured, and, even if obtained by a search warrant in violation of the defendant's constitutional or legal rights, it will still be admitted, if otherwise competent; and that defendant's only redress is an action for damages against the officer or person committing the trespass.... *To so hold is to emasculate the constitutional guaranty, and deprive it of all beneficial force or effect in preventing unreasonable searches and seizures. We think the evidence should have been excluded.*

*Id.* (emphasis added).

In Georgia, a series of intermediate appellate opinions beginning in 1907 established that the search and seizure and self-incrimination provisions of the Georgia Constitution required exclusion of evidence seized by search of the person pursuant to an illegal arrest. *See, e.g., Hammock v. State*, 1 Ga.App. 126, 58 S.E. 66 (1907); *Glover v. State*, 4 Ga.App. 455, 61 S.E. 862 (1908); *Scott v. State*, 14 Ga.App. 806, 82 S.E. 376 (1914). In *Hammock* the court reasoned that the law recognizes

> a public policy which would rather see the guilty go unpunished than have the guilt of the accused established by violently and unlawfully compelling him to furnish evidence against himself. To say, in a case such as this, that the officer furnishes the testimony, and that the defendant, therefore, has not been compelled to give evidence tending to incriminate himself, can be justified only by skimming the surface and neglecting to consider the penetralia of the transaction.

*Hammock*, 58 S.E. at 67. Georgia courts followed that rule until 1916 when the Georgia Supreme Court, in *Calhoun v. State*, 144 Ga. 679, 87 S.E. 893 (1916), overruled the *Hammock* line of cases. (As it applies to evidence obtained without sanction of judicial process, *Hammock* was disapproved of in *State v. Barela*, 23 N.M. 395, 403–04, 168 P. 545, 548 (1917)).

The period spanning the last decade of the nineteenth century and the first two decades of the twentieth century saw increasing legal challenges to the admissibility of evidence seized in violation of either state or federal constitutions. *See* Annotation, *Admissibility of Evidence Obtained by Illegal Search and Seizure*, 24 A.L.R. 1408 (1923) (collecting cases). The Supreme Court did not expressly require exclusion of evidence seized in contravention of the Fourth Amendment until 1914 when it decided *Weeks*. But the turn of the century surge in the number of challenges to the admissibility of illegally obtained evidence suggests that the issue loomed large in the legal community at the time the New Mexico Constitution was under consideration. *See* Annotation, *supra* (collecting cases from relevant time period).

From the above-mentioned historical context, it is difficult to draw any definitive conclusion about the framers' intent. We can speculate, based on the weight of authority in place at the time, that the framers determined that the *Dana* rule was well settled, and that Article II, Section 10 need do no more than proscribe unreasonable searches and seizures and state the probable cause requirements for a warrant. This Court, in 1917, noted the majority doctrine: Evidence that "is the result of an unlawful search or seizure ... *not under sanction of judicial process*, ordinarily has no effect whatever upon its admissibility." *Barela*, 23 N.M. at 404–405, 168 P. at 548 (emphasis added). The *Barela* court nonetheless acknowledged "the general doctrine

that, where the evidence is secured by means of process of the court, in whatever form, it is inadmissible." *Id.* at 404, 168 P. at 548. We could assume that the framers either were unaware of the controversy surrounding the constitutional guaranty or that the framers were aware of the controversy and simply deemed it insignificant. It also may be, however, that the framers were aware of the controversy and left interpretation to the courts rather than address the exclusion issue directly in the text of the constitution. This, we believe, is the most reasonable inference to be drawn from the history of the adoption of Article II, Section 10.

We conclude that the people of New Mexico left to the courts the task of interpreting the language of Article II, Section 10, which provides:

> The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures, and no warrant to search any place, or seize any person or thing, shall issue without describing the place to be searched, or the persons or things to be seized, nor without a written showing of probable cause, supported by oath or affirmation.

*—Core of interpretation.* Like its federal counterpart, Article II, Section 10 simply states a right—the right to be free from unreasonable searches and seizures. Article II, Section 10 does not by its express terms provide any guidance on how to preserve the right to be free from unreasonable searches and seizures or how to remedy its violations. We are satisfied, nonetheless, that the New Mexico constitutional prohibition against unreasonable searches and seizures requires that we deny the state the use of evidence obtained in violation of Article II, Section 10 in a criminal proceeding.

As a starting point, we observe that Article II, Section 10 expresses the fundamental notion that every person in this state is entitled to be free from unwarranted governmental intrusions. This broad right that we find implicit in Article II, Section 10, considered in the context of criminal prosecution brought to bear after violation of that right, is the paramount principle that underlies our conclusion.

While the federal exclusionary rule saw its beginnings in *Weeks,* as noted above, state courts prior to *Weeks* had articulated a rule of exclusion based on state constitutional guarantees. *See Sheridan,* 96 N.W. at 731; *Slamon,* 50 A. at 1097. The early state cases often were terse. The federal cases predating *Weeks* flesh out the early state rationales and provide the reasoning we find most persuasive today.

Perhaps most illuminating is *United States v. Mounday,* 208 F. 186 (D.Kan. 1913), decided just before *Weeks* and quoted in its entirety in the appellant's brief in *Weeks.* After arrest, but prior to grand jury indictment, defendants in *Mounday* filed an application with the district court requesting the return of property seized pursuant to an illegal search. The court granted the application and ordered the property returned. In so doing, the court framed the issue and stated its rationale for excluding evidence obtained pursuant to an illegal search:

> How, therefore, can the rights of defendants "to be secure in their persons, houses, papers and effects" be asserted by and granted to them, as the Constitution guarantees, in this court? Can it be done by placing in the hands of the government officials charged by law with the prosecution of defendants as offenders against its laws the fruits of this unlawful invasion of constitutional rights of defendants by the agents of the government, and this in the very teeth of that provision of article 5 above quoted, which declares "no person ... shall be compelled in any criminal case to be a witness against himself; nor be deprived of life, liberty or property without due process of law"? As yet, defendants stand charged with the commission of no criminal offense in this court. Even if so charged, this court must and will presume their innocence until the contrary is proven beyond a reasonable doubt. In order to secure such proof and assist the government in overcoming the presumption of innocence which attends upon de-

fendants and all other citizens until lawful conviction had, shall this court wink at the unlawful manner in which the government secured the proofs now desired to be used, and condone the wrong done defendants by the ruthless invasion of their constitutional rights, and become a party to the wrongful act by permitting the use of the fruits of such act? Such is not my conception of the sanctity of rights expressly guaranteed by the Constitution to a citizen.

*Mounday,* 208 F. at 189.

In response to the *Dana* rule, the court stated:

While I neither doubt nor deny the duty of all good men, and courts as well, to uphold the lawful enforcement of the criminal laws of our country, to the end that justice may be done and the guilty not go unpunished, yet, it is my belief the constitutional safeguards, deliberately framed for the purpose of protecting the rights of the individual citizen, are of equal, if not more, concern than the conviction of any one accused of the commission of a criminal act, no matter how guilty in fact he may be. No one, under our Constitution and laws may be adjudged guilty until the presumption of his innocence is overcome by evidence lawfully offered and lawfully received against him in open trial in a court of justice, as provided by and in accordance with the Constitution and laws of our country.... In this case it is the object of the government to cause defendants to be punished, if convicted, and to use such evidence now in the custody of the court to aid in securing such conviction. Surely such a flagrant violation of defendants' conceded constitutional rights should not in justice be permitted to be used to their prejudice. One wrong plus another does not make a right.

*Id.; accord Wong Quong Wong,* 94 F. at 833–34.

—*The constitutional right to be free from unreasonable search and seizure includes the exclusionary rule and precludes a good-faith exception.* The preceding cases suggest the essential core of our interpretation of Article II, Section 10. Interpretation occurs only in the context of a contested case, when the government has brought its resources to bear on an individual accused of a crime. We ask, much as the court in *Mounday* asked, how this Court can effectuate the constitutional right to be free from unreasonable search and seizure. The answer to us is clear: to deny the government the use of evidence obtained pursuant to an unlawful search. This, we believe, is the rationale at work in *Weeks.*

In *Weeks,* while Justice Day articulated concerns that the integrity of the judiciary would suffer by admitting illegally seized evidence, the essence of his reasoning rested upon the view that the exclusionary rule is of constitutional magnitude:

We therefore reach the conclusion that ... there was involved in the order refusing the application [for return of the seized property] *a denial of the constitutional rights of the accused,* and that the court should have restored these letters to the accused. In holding them and permitting their use upon the trial, we think prejudicial error was committed.

*Weeks,* 232 U.S. at 398, 34 S.Ct. at 346 (emphasis added).

In *State v. Davis,* 295 Or. 227, 666 P.2d 802 (1983) (en banc), the Supreme Court of Oregon, in explaining why exclusion of evidence illegally obtained is required under the Oregon Constitution, similarly did not rely upon deterrence or judicial integrity, nor did that court deem exclusion a judicial remedy. *Id.,* 666 P.2d at 805–07. Rather, the court reasoned that the exclusionary rule "effectuate[s] the law in the pending case." *Id.* at 806. The court explained:

The object of denying the government the fruits of its transgression against the person whose rights it has invaded is not to preserve the self-regard of judges but to preserve that person's rights to the same extent as if the government's officers had stayed within the law.

*Id.* at 806–07; *accord State v. Colson,* 274 N.C. 295, 163 S.E.2d 376, 384 (1968) ("Evidence unconstitutionally obtained is exclud-

ed in both state and federal courts as an essential to due process, not as a rule of evidence but as a matter of constitutional law."), *cert. denied,* 393 U.S. 1087, 89 S.Ct. 876, 21 L.Ed.2d 780 (1969).

The approach we adopt today focuses not on deterrence or judicial integrity, nor do we propose a judicial remedy; instead, our focus is to effectuate in the pending case the constitutional right of the accused to be free from unreasonable search and seizure. *See* Thomas S. Schrock & Robert C. Welsh, *Up from Calandra: The Exclusionary Rule as a Constitutional Requirement,* 59 Minn.L.Rev. 251, 324–26 (1974) (suggesting that the exclusionary rule is not a separate rule but is simply another name for judicial review of executive conduct). If, after consideration of the substantive constitutional issue, the court decides that the state has transgressed the constitutional rights of a person accused of a crime, we will not sanction that conduct by turning the other cheek.

The right to be free from unreasonable searches and seizures is in a sense a passive right, unlike the active rights of free speech and free exercise of religion. It is perhaps this nature of the right and the context in which it arises that make troublesome judicial review of violations. While the right to speak freely is the right to actively engage in public discourse without governmental restraint, one does not actively engage in freedom from governmental intrusion; that right lies in waiting, to curb the state's zeal in execution of the criminal laws. When a court finds the government has unconstitutionally restricted a person's speech, the court orders the restraint lifted and enjoins further re-

straint. What we propose today does no more. Once violation of Article II, Section 10 has been established, we do no more than return the parties to where they stood before the right was violated. We do not deem judicial review of unconstitutional restraints on speech a mere "judicial remedy," nor should we so deem the exclusion of unconstitutionally seized evidence that Article II, Section 10 requires.

Surely, the framers of the Bill of Rights of the New Mexico Constitution meant to create more than "a code of ethics under an honor system." Stewart, *supra,* at 1383–84. We think it implicit in a regime of enumerated privileges and immunities that the framers intended to create rights and duties and that they made it imperative upon the judiciary to give meaning to those rights through judicial review of the conduct of the separate governmental bodies. As Justice Stewart has observed, "[t]he primary responsibility for enforcing the Constitution's limits on government, at least since the time of *Marbury v. Madison,* [5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803),] has been vested in the judicial branch." Stewart, *supra,* at 1384. The very backbone of our role in a tripartite system of government is to give vitality to the organic laws of this state by construing constitutional guarantees in the context of the exigencies and the needs of everyday life. Denying the government the fruits of unconstitutional conduct at trial best effectuates the constitutional proscription of unreasonable searches and seizures by preserving the rights of the accused to the same extent as if the government's officers had stayed within the law.[9] The basis we

---

**9.** We hasten to add that the narrow issue before us is the constitutionality of the admission of evidence seized in violation of Article II, Section 10 in a criminal action founded on illegal governmental conduct. Accordingly, criticism that the exclusionary rule benefits only the guilty misses the point. The exclusionary rule, as we have noted above, is the necessary corollary of the constitutional mandate. It arises out of criminal actions founded on illegally seized evidence. The constitutional issue of illegal searches that do not lead to criminal prosecution simply is not before us. It may be that in that context the constitutional guarantee will

require a different response. The answer must await the proper case.

Criticism that the exclusionary rule benefits only the guilty has imposed a skewed perspective that has haunted analysis of search and seizure law from the time of *Dillon.* The issue is the interpretation of the New Mexico Constitution in this case to effectuate its mandate, not whether the person accused should or should not be convicted. To the extent that *Dillon* reflects the latter perspective and to the extent it conflicts with our holding concerning the exclusionary rule under Article II, Section 10, it is hereby overruled.

articulate today for the exclusionary rule in this state—to effectuate the constitutional right in the pending case—is incompatible with any exception based on the good-faith reliance of the officer on the magistrate's determination either of probable cause or of the reasonableness of the search.[10]

Although the rule we announce today is not premised on policy concerns of judicial integrity or deterrence, we cannot deny that the rule advances those important state policies. Implicit in the rationales of *Sheridan, Weeks,* and *Silverthorne* is the notion that admission of improperly seized evidence denigrates the integrity of the judiciary—judges become accomplices to unconstitutional executive conduct. The real and perceived affront to the integrity of the New Mexico judiciary is a critical state interest that militates in favor of the exclusionary rule. Similarly, deterrence of future constitutional violations is a critical state interest that is a by-product of the exclusionary rule. Deterrence, however, is not the talisman asserted in recent Supreme Court pronouncements. *See, e.g., Leon,* 468 U.S. at 916, 104 S.Ct. at 3417 ("[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates.").

To be sure, in no sense does the "rule's *survival* depend[ ] on proof that it is significantly influencing police behavior." Kamisar, *supra,* at 598–600 (arguing that the exclusionary rule is founded on principled constitutional interpretation). Additionally, the deterrence effectuated by the exclusionary rule reaches not only, as *Leon* asserts, the particular officer involved, but this process. The exclusionary rule imposes the template of the constitution on the entire warrant-issuing process. Because the good-faith exception to the federal exclusionary rule is incompatible with the constitutional protections found under Article II, Section 10, the fruits of the search conducted in violation of the New Mexico Constitution in this case must be suppressed. For all of the foregoing reasons, we affirm the judgment of the Court of Appeals upholding the trial court's order suppressing the evidence.

IT IS SO ORDERED.

BACA, MONTGOMERY, FRANCHINI and FROST, JJ., concur.

**10.** We are not alone in rejecting as a matter of state constitutional law the federal good-faith exception. The highest courts of at least seven states—Connecticut, Idaho, New Jersey, New York, North Carolina, Pennsylvania, and Vermont—have rejected the good-faith exception on state constitutional grounds. *See State v. Marsala,* 216 Conn. 150, 579 A.2d 58 (1990); *State v. Guzman,* 122 Idaho 981, 842 P.2d 660 (1992); *State v. Novembrino,* 105 N.J. 95, 519 A.2d 820 (1987); *People v. Bigelow,* 66 N.Y.2d 417, 497 N.Y.S.2d 630, 488 N.E.2d 451 (1985); *State v. Carter,* 322 N.C. 709, 370 S.E.2d 553 (1988); *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991); *State v. Oakes,* 157 Vt. 171, 598 A.2d 119 (1991); *see also Mason v. State,* 534 A.2d 242 (Del.1987) (rejecting good-faith exception on statutory grounds); *Gary v. State,* 262 Ga. 573, 422 S.E.2d 426 (1992) (same); *Commonwealth v. Upton,* 394 Mass. 363, 476 N.E.2d 548 (1985) (same); *Stringer v. State,* 491 So.2d 837 (Miss.1986) (Robertson, J., concurring) (urging that good-faith exception is incompatible with state constitutional search and seizure jurisprudence); *Lockett v. State,* 852 S.W.2d 636 (Tex.Ct.App.1993) (holding that statutory good-faith exception applies only if affidavit sets forth probable cause). Michigan's intermediate

appellate court likewise has held the good-faith exception incompatible with its state constitution. *People v. Sundling,* 153 Mich.App. 277, 395 N.W.2d 308 (1986), *leave for appeal denied,* 428 Mich. 887 (1987); *see also State v. Grawien,* 123 Wis.2d 428, 367 N.W.2d 816 (1985) (stating it was not the function of the court of appeals to adopt a good-faith exception that would conflict with the Wisconsin Supreme Court's interpretation of the Wisconsin Constitution).

To date, the highest courts of at least five states—Arkansas, California, Kentucky, Missouri, and Ohio—have embraced the federal good-faith exception. *Jackson v. State,* 291 Ark. 98, 722 S.W.2d 831 (1987); *People v. Camarella,* 54 Cal.3d 592, 286 Cal.Rptr. 780, 818 P.2d 63 (1991); *Crayton v. Commonwealth,* 846 S.W.2d 684 (Ky.1992) (petition for cert. filed); *State v. Sweeney,* 701 S.W.2d 420 (Mo.1985) (en banc); *State v. Wilmoth,* 22 Ohio St.3d 251, 22 OBR 427, 490 N.E.2d 1236 (1986); *See also Ewing v. State,* 613 N.E.2d 53 (Ind.Ct.App.1993) (applying exception); *West v. Commonwealth,* 432 S.E.2d 730 (Va.Ct.App.1993) (holding good faith exception applies in Virginia). Florida's constitution expressly applies federal standards. *See State v. Kingston,* 617 So.2d 414 (Fla.Ct.App.1993) (applying *Leon* exception).